IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES P. SCANLAN on his own      :        CIVIL ACTION
behalf and all others similarly  :
situated                         :
                                 :
        v.                       :
                                 :
AMERICAN AIRLINES GROUP, INC.,   :        NO. 18-4040
et al.                           :


MEMORANDUM

Bartle, J.                                      June 18, 2019


        Plaintiff James P. Scanlan, a commercial airline pilot
and a Major General in the United States Air Force Reserve, has
sued American Airlines Group, Inc. ("AAG") and American
Airlines, Inc. ("AAI"), his employer and AAG's wholly owned
subsidiary, in this putative class action under the Uniformed
Services Employment and Reemployment Rights Act ("USERRA")
38 U.S.C. §§ 4301 et seq.  Specifically, the amended complaint
alleges that he and others similarly situated have been
wrongfully denied certain rights and benefits from AAG and AAI
while on short-term military leave which other employees receive
while absent from work for jury duty, sick leave, and union
leave.  Scanlan seeks declaratory, injunctive, and monetary
relief.  Before the court is the motion of defendants to dismiss
the amended complaint for failure to state a claim upon which

relief can be granted pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure.

I

When considering a motion to dismiss for failure to
state a claim under Rule 12(b)(6), the court must accept as true
all factual allegations in the complaint and draw all reasonable
inferences in the light most favorable to the plaintiff.
See Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir.
2008); Umland v. PLANCO Fin. Servs., Inc., 542 F.3d 59, 64
(3d Cir. 2008).  We must then determine whether the pleading at
issue "contain[s] sufficient factual matter, accepted as true,
to 'state a claim for relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell
Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim
must do more than raise a "mere possibility of misconduct."
Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009)
(quoting Iqbal, 556 U.S. at 679).

On a motion to dismiss under Rule 12(b)(6), the court
may consider "allegations contained in the complaint, exhibits
attached to the complaint, and matters of public record" as well
as "an undisputedly authoritative document that a defendant
attaches as an exhibit to a motion to dismiss if the plaintiff's
claims are based on the document."  Levins v. Healthcare Revenue
Recovery Grp. LLC, 902 F.3d 274, 279-80 (3d Cir. 2018) (quoting

Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,
998 F.2d 1192, 1196 (3d Cir. 1993)).

                                II

          For present purposes, we accept as true the
allegations set forth in the amended complaint and the
undisputed documents it references and relies upon.  Scanlan has
worked as a pilot for AAI since October 1999 and participated in
the AAG's Global Profit Sharing Plan (the "Plan") in 2016 and
2017.  He has also served in the armed forces since 1985 and is
currently a Major General in the United States Air Force
Reserve.  Throughout his employment with AAI and while he has
participated in the Plan, Scanlan has taken short-term periods
of leave to perform his Air Force Reserve obligations.  While he
was on military leave for a total of 128 days in 2016 and for
132 days in 2017, most of the periods of leave were for only a
few days at a time although some extended up to fourteen days.

          AAI does not pay employees who are out on short-term
military leave but does pay employees when they take other forms
of short-term leave, such as jury duty, sick leave, and union
leave.  If employees are on jury duty, they receive the
differential between their regular compensation and their
payment as jurors.  They obtain their full pay when on
short-term sick leave or union leave.  Union leave may be

short-term but up to three pilots will be paid while serving full time on union business.

AAG is the parent company not only of AAI, but also of Envoy Airlines, Inc., Piedmont Airlines, Inc, and PSA Airlines. AAG adopted the Plan effective January 1, 2016 to share AAG's profits with employees of AAI and other subsidiary airlines. Employees who are eligible to participate in the Plan include pilots, flight attendants, mechanics, and passenger service employees as well as non-union-represented management and non-management employees.

AAG is obligated under the Plan to pay profit sharing awards annually in the early part of each year to the Plan's participants that total five percent of AAG's pre-tax earnings for the preceding year.  Participants receive their award as a lump sum cash payment subject to any withholding for tax purposes and may contribute all or part of the award to their retirement plans, pursuant to the terms of those plans.  AAG calculates each participant's individual award by dividing the five percent of AAG's pre-tax earnings by the aggregate amount of all participants' earnings and multiplying this value by that participant's "eligible earnings."

AAG does not credit AAI employees under the Plan with wages they would have otherwise earned had they not been on short-term military leave.  However, it does include the

-4-

compensation of employees for the periods when they are on jury duty, sick leave, and union leave.  As a result of AAG's failure to include as eligible earnings their imputed income while on periods of short-term military leave, Scanlan and other similarly situated employees received lower profit sharing awards in 2016 and 2017 than they would have otherwise received.

III

USERRA is the latest in a series of laws, such as the Vietnam Era Veterans' Readjustment Assistance Act ("VEVRAA"), and its amendment the Veterans' Reemployment Rights Act of 1974 ("VRRA"), that Congress has enacted to protect the rights of military service members who take leaves of absence from their employers to perform military service.  Crews v. City of Mt. Vernon, 567 F.3d 860, 864 (7th Cir. 2009); Rogers v. City of San Antonio, 392 F.3d 758, 762 (5th Cir. 2004).  In enacting USERRA, Congress emphasized its continuity with the VRRA and with the body of caselaw that had developed under USERRA's predecessor statutes.  United States v. Alabama Dept. of Mental Health and Mental Retardation, 673 F.3d 1320, 1329 n.6 (11th Cir. 2012); Crews, 567 F.3d at 864).

Congress stated in the first section of USERRA that its purposes, among others, are "to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can

-5-

result from such service" and "to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. §§ 4301(a)(1) and (a)(3); <u>see also</u> <u>Carroll v. Delaware River Port Auth.</u>, 843 F.3d 129, 131 (3d Cir. 2016). As our Court of Appeals has explained, "we must construe USERRA's provisions liberally, in favor of the service member." <u>Gordon v. Wawa</u>, 388 F.3d 78, 81 (3d Cir. 2004).  Likewise, the Supreme Court has recognized a rule of construction that "interpretative doubt is to be resolved in the veteran's favor." <u>Brown v. Gardner</u>, 513 U.S. 115, 118 (1994).

We first consider AAI's motion to dismiss count III for failure to state a claim.  Scanlan alleges that AAI's policy of not paying employees out on short-term military leave while paying employees for comparable forms of short-term leave, such as for jury duty, sick leave, and union leave, violates § 4316(b)(1) of USERRA.

This section of USERRA provides, in relevant part:

(b)(1) . . . a person who is absent from a position of employment by reason of service in the uniformed services shall be--

(A) deemed to be on furlough or leave of absence while performing such service; and

(B) entitled to such other <u>rights and benefits</u> not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a

contract, agreement, policy, practice, or
plan in effect at the commencement of such
service or established while such person
performs such service.

38 U.S.C. § 4316(b)(1) (emphasis added).

Section 4303 defines "rights and benefits" as follows:

(2) . . . "rights and benefits" means terms,
conditions, or privileges of employment,
including any advantage, profit, privilege,
gain, status, account, or interest
(including wages or salary for work
performed) that accrues by reason of an
employment contract or agreement or an
employer policy, plan, or practice and
includes rights and benefits under a pension
plan, a health plan, an employee stock
ownership plan, insurance coverage and
awards, bonuses, severance pay, supplemental
unemployment benefits, vacations, and the
opportunity to select work hours or location
of employment.

38 U.S.C. § 4303.

AAI, at the pleading stage, does not contest Scanlan's
allegations that it pays its employees on jury duty, sick leave,
and union leave, and does not pay those on short-term military
leave.  Nor does AAI at this time challenge Scanlan's assertion
in the amended complaint that short-term military leave is
comparable to absence from work for jury duty, sick leave or
union leave.  See Brill v. AK Steel Corp., No. 2:09-CV-534, 2012
WL 893902, at *3-7 (S.D. Ohio Mar. 14, 2012).  AAI simply argues
that USERRA does not require employers to pay its employees
wages for periods when they are on military leave.  Ordinary

-7-

wages for work not performed while on military leave, AAI contends, are not "rights and benefits" under § 4316(b)(1).

In opposition to AAI's motion to dismiss, Scanlan relies heavily on the decision of our Court of Appeals in Waltermyer v. Aluminum Co. of Am., 804 F.2d 821 (3d Cir. 1986). There, plaintiff took periods of leave from work for reserve training that included two designated holidays.  Id. at 822. Employees were generally not paid for holidays unless they worked every other day of the week in which the holiday fell. Id.  However, employees on jury duty, testifying in court, or suffering from illness were paid regardless.  Plaintiff claimed that his employer discriminated against him under the VEVRAA because of his status as a reservist in failing to pay him for those two days when those not on reserve duty as described above were paid for those holidays.  Id.  The Court of Appeals, reversing the district court, ordered judgment to be entered in favor of the plaintiff for the holiday pay at issue.  It did so on the ground that his military leave was comparable to the non-military forms of leave because of their short duration and "lack of choice by the employees."  Id. at 825.  Paying plaintiff for those holidays established "equality . . . not preferential treatment."  Id.

The Court in Waltermyer noted that the plaintiff was not suing for compensation for other days not worked and thus

-8-

was seeking less compensation than was paid to those on jury duty who received their regular wage while absent from their jobs.  The Court specifically limited its holding to the question of what it described as "holiday pay."  Id.  The issue referenced but not decided in Waltermyer and now presented here is whether the failure to pay reservists on military leave the differential between their regular civilian pay and their military pay states a viable claim under § 4316(b)(1) of USERRA when other employees are either paid the differential while on jury duty or their full regular pay while absent from work on sick leave or union leave.

AAI cites a number of cases including the Supreme Court's decision in Monroe v. Standard Oil Co., 452 U.S. 549 (1981) in support of its position that Scanlan has not stated a claim.  AAI quotes the Supreme Court's language that the legislative history of the VEVRAA is "barren of any indication that Congress intended employers to compensate employees for work hours missed while fulfilling military reserve obligations."  Id. at 562 n.13.

In Monroe, the petitioner was required to work five days per week, although he did not work the same days each week. He was also a member of the military reserve and had training on some weekend days.  His military schedule occasionally forced him to miss scheduled weekend work when he was unable to switch

-9-

shifts with coworkers.  Petitioner's employer permitted him to take leaves of absence to perform his military duties but did not pay him for his missed work days or permit him to make up missed work by picking up additional shifts.  Id. at 551-52. The Supreme Court held that the VEVRAA does not require an employer to make reasonable work schedule accommodations for members of the military not made for other employees.  We note that our Court of Appeals in Waltermyer discussed Monroe but did not find Monroe to be an impediment to its ruling in favor of holiday pay for an employee on short-term military leave.

Monroe and other decisions that AAI cites are distinguishable from the circumstances alleged here.  In none of those cases were there any allegations that employees absent from work for non-military reasons were treated more favorably than those who were absent on short-term military duty. See Miller v. City of Indianapolis, 281 F.3d 648, 651 (7th Cir. 2002); Duncan v. Tyco Fire Prod., LP, No. 1:16-CV-00916, 2018 WL 3303305, at *4 (N.D. Ala. July 5, 2018); Buckley v. Peak6 Investments, LP, 827 F. Supp. 2d 846, 856 (N.D. Ill. Oct. 27, 2011); Brooks v. Fiore, No. 00-803, 2001 WL 1218448, at *9-10 (D. Del. Oct. 11, 2001).

Under 38 U.S.C. § 4331, the Secretary of Labor, in consultation with the Secretary of Defense, is authorized to promulgate regulations to implement USERRA.  Defendants rely on

-10-

a Department of Labor regulation which states in part, "although USERRA does not require an employer to pay an employee for time away from work performing service, an employer policy, plan, or practice that provides such a benefit is permissible under USERRA."  20 C.F.R. § 1002.7.  Defendants' citation of this regulation does not present the complete picture.  Scanlan calls our attention to another Department of Labor regulation under USERRA which mirrors what he alleges here and requires payment to those on short-term military duty when paid non-military leave is granted in comparable situations.  It provides:

> (b) If the non-seniority benefits to which employees on furlough or leave of absence are entitled vary according to the type of leave, the employee must be given the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services.  In order to determine whether any two types of leave are comparable, the duration of the leave may be the most significant factor to compare.  For instance, a two-day funeral leave will not be "comparable" to an extended leave for service in the uniformed service.  In addition to comparing the duration of the absences, other factors such as the purpose of the leave and the ability of the employee to choose when to take the leave should be considered.

20 C.F.R. § 1002.150(b) (emphasis added).

AAI also focuses on the specific words of § 4316(b)(1) to support its argument that Scanlan has not stated a claim for relief under USERRA.  Specifically, it maintains that the phrase "rights and benefits" as defined in § 4303 and used in

-11-

§ 4316(b)(1) does not encompass the relief Scanlan seeks.
According to AAI, "rights and benefits" to which an employee in
uniformed service is entitled while on leave does not include
wages for work not performed.

We turn to the words used by Congress in USERRA. The
definition of "rights and benefits" in 38 U.S.C. § 4303(2) is
extremely broad. It means "the terms, conditions, or privileges
of employment, including any advantage, profit, privilege, gain,
status, account, or interest (including wages or salary for work
performed) . . . and includes . . . bonuses, severance pay,
supplemental unemployment benefits, [and] vacations." 38 U.S.C.
§ 4303(2) (emphasis added). Section 4303(2) was amended in 2010
to change the parenthetical from "other than wages or salary for
work performed" to the more inclusive language stated above.
See Gross v. PPG Indus., Inc., 636 F.3d 884, 889 n.3 (7th Cir.
2011). The definition of rights and benefits, of course,
embraces not only wages or salary for work performed but much
more. Because the definition uses the words "including" and
"includes," the words following "including" and "includes" are
simply illustrative of the expansive language "the terms,
conditions or privileges of employment" which precedes the
illustrations. The examples mentioned are not exclusive.
See Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,
314 U.S. 95, 100 (1941).

In Waltermyer, our Court of Appeals awarded holiday pay, that is wages for work not performed.  804 F.2d at 822.  If compensation for holidays in Waltermyer and for severance pay and vacations explicitly referenced in § 4316(b)(1) are merely illustrations of the definition of rights and benefits and involve pay for work not performed, we are hard pressed to understand why compensation for time on military leave for work not performed would not also fit within the definition.

Section 4316(b)(1), of course, only requires employees on military leave to be provided with comparable rights and benefits to which those on non-military absences are entitled. If a right and benefit is not provided to an employee on a non-military related absence, the right or benefit is not due the employee on military leave.  As noted above, AAI concedes for present purposes that short-term military leave is comparable to leave for jury duty, sickness or union responsibilities.  While compensation for time on military leave is not required when it would be preferential treatment, § 4316(b)(1) mandates payment when failure to pay such compensation constitutes unequal treatment for those on reserve duty.

AAI points to the use of the word "accrues" in the definition of rights and benefits under § 4303 to negate Scanlon's claim.  It argues that rights and benefits does not

-13-

include wages paid to an employee on military leave because such wages are not a term, condition, or privilege of employment in the language of § 4303 that "accrues by reason of an employment contract or agreement or an employee policy plan or practice." Instead, AAI contends that wages, including wages for work not performed, do not accrue but are earned. AAI, in support, cites the second definition of "accrue" in <u>Black's Law Dictionary</u> (11th ed. 2019): "To accumulate periodically, to increase over a period of time." AAI overlooks, however, the first definition in <u>Black's Law Dictionary</u>: "To come into existence as an enforceable claim or right." <u>Id.</u> The right to be paid for work not performed while on military leave comes into existence and thus accrues as an enforceable claim in the exact same way as the right to holiday pay, severance pay, or vacation pay, all for time periods when no work is performed. AAI's argument based on the definition of "accrues" fails.

AAI further maintains that § 4316(b)(1) applies in favor of an employee on short-term military leave only when other employees have "a leave of absence under a contract, agreement, policy, practice or plan." AAI contends that Scanlan has no claim here because the pilots' collective bargaining agreement ("CBA") does not consider jury duty, sick leave, and union leave to be "leaves of absence." This argument, too, is without merit. First, § 4316(b)(1) defines a person to be on a

-14-

leave of absence who is "absent from a position of employment by reason of service in the uniformed services."  Thus, "leave of absence" is not a technical term under USERRA but simply means an absence from work.  Moreover, an employer's or a union's different definition of leave of absence in a CBA or otherwise cannot undermine the requirements of USERRA.  As the Supreme Court has explained in <u>Accardi v. Pennsylvania Railroad Co.</u> regarding a statute granting employment benefits to service members, "employers and unions are [not] empowered by the use of transparent labels and definitions to deprive a veteran of substantial rights guaranteed by the Act."  383 U.S. 225, 229, (1966).

Finally, AAI contends that a ruling in favor of plaintiff would have negative or unintended consequences.  It raises the specter, for example, that employers would no longer pay employees for jury service or sick leave in order to avoid paying reservists on military duty while away from work.  While we doubt this would occur, we must read the unambiguous text of USERRA as written by Congress without engaging in speculation about any collateral consequences.

We return to the purposes of USERRA "to encourage noncareer service in the uniform services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service" and "to prohibit

-15-

discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301. The words of USERRA must be construed liberally in favor of those in the uniformed services. Gordon, 388 F.2d at 81. Congress, we agree, did not impose a requirement in USERRA that employers in all instances provide differential pay to employees while on military leave. Nonetheless, § 4316(b)(1) clearly mandates that employers on military leave be treated equally with other employees with respect to their terms, conditions, and privileges of employment. As our Court of Appeals stated in Waltermyer in connection with USERRA's predecessor, "the statute establishes equality as the test." 804 F.2d at 824. That is likewise true here. Equal treatment exists only if those employees on short-term military leave have the same rights and benefits as other employees in comparable situations. Scanlan has plausibly alleged that he and those similarly situated have not been afforded equal treatment with other employees in comparable situations. See Brill, 2012 WL 893902. We see no material difference between the allegations here and those in Waltermyer. Count III of the amended complaint states a viable claim for relief under § 4316(b)(1) of USERRA.

IV

Scanlan alleges in count I of the amended complaint that AAG violated § 4316(b)(1) of USERRA by not crediting

-16-

participants who took short-term military leave with imputed earnings for those periods when calculating their profit sharing awards, while crediting participants with their full earnings while on jury duty, sick leave, and union leave.[1]  As a result, he asserts that participants who took short-term military leave had lower "eligible earnings," and received lower profit sharing awards, than provided to employees who take comparable forms of leave.

Our analysis with respect to count III likewise applies with respect to count I.  Scanlan has plausibly alleged a claim under § 4316(b)(1) that AAG has not provided equal rights and benefits under its profit sharing Plan to employees on short-term military leave.  Scanlan's claim under count I survives.

V

Finally, AAG moves to dismiss count II which alleges that AAG's calculation of profit sharing awards under its Plan violates § 4318(b)(1) of USERRA.

Pursuant to the Plan, as noted above, AAG sets aside five percent of its pre-tax earnings each plan year for

---

1.  Plaintiff maintains that AAG as well as AAI is an employer under USERRA because § 4303(4) states that "employer means any person . . . or entity that pays salary or wages for work performed or that has control over employment opportunities."  AAG has not challenged its status as an employer.

participating employees.  Employees receive their awards as a lump sum payment in the beginning of the following year, and may elect to deposit all or part of their award in their retirement plans if the plan so permits.  AAG calculates each employee's award by dividing this total by the aggregate amount of all participating employee's earnings and multiplying that value by that employee's eligible earnings that year.  AAG does not credit military leave in an employee's eligible earnings but does so for jury duty, sick leave, and union leave.

Section 4318 of USERRA governs the right of employees to benefits under "employee benefit pension plans, (including those described in sections 3(2) and 3(33) of the Employee Retirement Income Security Act of 1974)," ("ERISA").  38 U.S.C. § 4318(a)(1)(A).  USERRA, according to Department of Labor regulations, also covers certain pension plans not covered by ERISA.  20 C.F.R. § 1002.260(a).

Section 4318(b)(1) states in relevant part:

(b)(1) An employer reemploying a person under this chapter shall, with respect to a period of service described in subsection (a)(2)(B), be liable to an employee pension benefit plan for funding any obligation of the plan to provide the benefits described in subsection (a)(2) and shall allocate the amount of any employer contribution for the person in the same manner and to the same extent the allocation occurs for other employees during the period of service. For purposes of determining the amount of such liability and any obligation of the plan, earnings and forfeitures shall not be included. For purposes of

-18-

> determining the amount of such liability and for
> purposes of section 515 of the Employee
> Retirement Income Security Act of 1974 or any
> similar Federal or State law governing pension
> benefits for governmental employees, service in
> the uniformed services that is deemed under
> subsection (a) to be service with the employer
> shall be deemed to be service with the employer
> under the terms of the plan or any applicable
> collective bargaining agreement.

38 U.S.C. § 4318.

Section 3(2) of ERISA, cited in USERRA, states that "the term 'employee benefit plan' or 'plan' means an employee welfare benefit plan or an <u>employee pension benefit plan</u> or a plan which is both an employee welfare benefit plan and an employee pension benefit plan."  29 U.S.C. § 1002(3) (emphasis added).  ERISA goes on to define an "employee pension benefit plan" and "pension plan" as:

> [A]ny plan, fund, or program which was heretofore
> or is hereafter established or maintained by an
> employer or by an employee organization, or by
> both, to the extent that by its express terms or
> as a result of surrounding circumstances such
> plan, fund, or program--
>
>> (i) provides retirement income to employees,
>> or
>>
>> (ii) results in a deferral of income by
>> employees for periods extending to the
>> termination of covered employment or beyond,
>
> regardless of the method of calculating the
> contributions made to the plan, the method of
> calculating the benefits under the plan or the
> method of distributing benefits from the plan.

-19-

29 U.S.C. § 1002(2)(A).  ERISA expressly exempts from its coverage certain plans that would otherwise meet its definition of an employee benefit plan, including plans administered by the government and churches.  29 U.S.C. § 1003(b).

Scanlan contends that the Plan meets the ERISA definition of an employee pension benefit plan and thus falls within § 4318 because it permits employees to designate an amount of their profit sharing awards toward their retirement. The mere fact that employees may elect to allocate some or all of their profit sharing awards toward their retirement funds does not mean that ERISA covers the Plan.

Our Court of Appeals has relied upon Murphy v. Inexco Oil Co., 611 F.2d 570 (5th Cir. 1980) as a "leading case" on employee pension benefit plans under ERISA and has cited it with approval.  See Oatway v. Am. Int'l Grp., Inc., 325 F.3d 184, 187 (3d Cir. 2003).  The Court in Murphy examined the definition of an "employee benefit pension plan" under ERISA and stated that it is "not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." 611 F.2d at 575.  The phrase "provides retirement income" in 29 U.S.C. § 1002(2)(A)(i) "patently refer[s] only to plans designed for the purpose of paying retirement income."  Id.  The Court further noted that Congressional regulations exclude from the definition payments made as bonuses, unless the payments are

systematically deferred until the termination of employment or so as to provide retirement income.  <u>Id.</u> (citing 29 C.F.R. § 2510.3-2(c)).

The plan at issue in <u>Murphy</u> was one where the company awarded employees the right to receive a royalty, that is, a fraction of the proceeds that may accrue from certain projects. Employees maintained that right even after they left the company.  The Court held it was not an employee benefit pension plan under § 1002(2)(A)(i) of ERISA because it was "designed to provide current rather than retirement income."  <u>Id.</u> at 575-76. The plan also did not result in the deferral of income under § 1002(2)(A)(ii) because the royalty was paid annually to the employee as it was received.  The mere fact that some payments under the plan may be made after retirement did not bring it within the grasp of ERISA coverage.  <u>Id.</u> at 575.  Instead, the Court reasoned that this plan was a bonus plan that did not systemically defer income toward retirement.  <u>Id.</u>

Our Court of Appeals relied on the <u>Murphy</u> analysis to determine whether agreements that allowed plaintiff to purchase certain shares of stock of his employer were "incentive bonuses" or deferred compensation agreements covered by ERISA.  <u>Oatway</u>, 325 F.3d at 187.  The Court explained that "[t]he <u>Murphy</u> court reasoned that an ERISA plan is only a plan 'designed for the purpose of paying retirement income whether as a result of [its]

-21-

express terms or surrounding circumstances.'" Id. at 188
(citing Murphy, 611 F.2d at 575-76).  The Court agreed with the
district court's characterization of the plan as "an incentive
plan designed to provide a financial incentive for employees to
remain" with the employer.  Post-retirement income was only
incidental to the goal of providing current compensation.
Id. at 189.  The Court also observed that the stock options were
discretionary, given in recognition of special service, and
awarded in addition to regular compensation.  Moreover, they did
not result in the deferral of income even though they could be
exercised after plaintiff retired.  Id.  Because of these
characteristics, the Court concluded that the stock options were
not ERISA plans and affirmed the district court's dismissal of
plaintiff's complaint under Rule 12(b)(6).  Id.

        To sustain count II, plaintiff relies on Tolbert v.
RBC Capital Markets Corp., 758 F.3d 619 (5th Cir. 2014), a more
recent decision of the Fifth Circuit.  There, plaintiffs
participated in a wealth accumulation plan where funds were
funneled into either "Voluntary Deferred Compensation,"
"Mandatory Deferred Compensation" or "Company Contribution"
categories.  758 F.3d at 622.  In this case, the Fifth Circuit
emphasized that the plan in issue described itself as a deferred
compensation plan allowing employees "to defer receipt of a
portion of their compensation to be earned with respect to the

upcoming Plan Year." Id. at 626.  The parties did not argue,
nor did the record indicate, that the plan was a bonus program
under 29 C.F.R. § 2510.3-2.  Id.  We find this case to be
inapposite.  In any event, we are bound by our Court of Appeals'
decision in Oatway, which adopted the reasoning in Murphy.

        The Plan presently before the court is designed to
provide current rather than retirement income.  It is analogous
to those plans in Murphy and Oatway.  The Purpose section of the
Plan itself states that it "rewards eligible Employees . . . for
their efforts in helping achieve the strategic, financial, and
operating objectives of . . . AAG for a designated Plan Year by
providing such eligible Employees with an opportunity to share
in AAG's profits for such year."  Under the Plan, AAG pays
participating employees their share of the total profit sharing
award for the previous year in the form of a lump-sum cash
payment within the first few months of the following year.

        While the employees participating in the Plan may
place the lump sum payments in their retirement plans, the Plan
in essence is an extra compensation or bonus plan where payments
are awarded in addition to regular compensation.  It is not a
deferred compensation plan.  The Plan specifically states that
it is intended to be exempt from regulation under ERISA as a
"bonus program" as defined in 29 C.F.R. § 2510.3-2(c) and
"payroll practice" under 29 C.F.R. § 2510.3-1(b) which governs

-23-

employee welfare benefit plans.  Of course, this language does not guarantee the Plan is in fact exempt from ERISA, but Oatway directs us to consider it because it reflects employer intent. See Oatway, 325 F.3d at 186; Tolbert, 758 F.3d at 625.  As a bonus plan, the Plan could meet ERISA's definition if it systematically deferred payments to the termination of employment or so as to provide retirement income.  See Murphy, 611 F.2d at 575.  The Plan does not do so.  The mere option to deposit the lump sum payments into employees' retirement funds does not bring the Plan within the embrace of ERISA.

        Scanlan further argues that even if it is not an employee benefit pension plan under ERISA, it is still covered by USERRA.  According to USERRA regulations published by the Department of Labor, "USERRA also covers certain pension plans not covered by ERISA, such as those sponsored by a State, government entity, or church for its employees."  20 C.F.R. § 1002.260(a).  We reject Scanlan's contention that this regulation applies to the Plan at issue.  The Plan certainly is not "sponsored by a State, government entity, or church" and is not otherwise similar to any such plan.  Moreover, we read this regulation as more likely clarifying that USERRA incorporates ERISA's general definition of employee benefit pension plan but does not contain the same express exclusions listed in 29 U.S.C.

§ 1003(b), such as plans administered by the government and churches.

The Plan is neither an employee benefit pension plan under ERISA nor a plan exempted from ERISA but covered by USERRA.  Scanlan has not stated a claim for relief in count II under § 4318(b)(1).