IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES P. SCANLAN on his own          :          CIVIL ACTION
behalf and all others similarly      :
situated, et al.                     :
                                     :
          v.                         :
                                     :
AMERICAN AIRLINES GROUP, INC.,       :
et al.                               :          NO. 18-4040

MEMORANDUM

Bartle, J.                                      November 2, 2022

          Plaintiffs James P. Scanlan, an American Airlines
pilot and a retired Major General in the United States Air Force
Reserve, and Carla Riner, an American Airlines pilot and a
Brigadier General in the Delaware Air National Guard, have
brought this class action against defendants American Airlines
Group, Inc. ("AAG") and American Airlines, Inc. ("American")
pursuant to the Uniformed Services Employment and Reemployment
Rights Act ("USERRA"), 38 U.S.C. §§ 4301 et seq., and for breach
of contract.  Plaintiffs assert that for the period between
January 1, 2013, and October 31, 2021, they and the class of
American pilots they represent have not received the
compensation or benefits due to them under USERRA and under the
contract.

          Before the court are the cross-motions of the parties
for summary judgment.  Defendants seek summary judgment as to

all of plaintiffs' claims while plaintiffs seek summary judgment only on their breach-of-contract claim.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

The court views the facts and draws all inferences in favor of the nonmoving party.  See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  When reviewing cross-motions for summary judgment, the court "must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2016)).

II

The following facts are undisputed.  Although American
permits its pilots to take leaves of absence to serve in the
military, it does not compensate them for their time away from
the job.  In contrast, American offers its pilots three days of
paid bereavement leave upon the death of a qualifying relative.
If pilots are summoned for jury duty, they receive the
differential between their regular compensation and the payment
they receive as jurors.

Scanlan and Riner represent a class of individuals who
at some point during the class period simultaneously served as
pilots with American and as members of a military branch.[1]  As
noted above, they advance three claims against defendants.
Under count III, plaintiffs seek a declaratory judgment that
USERRA obligates American to provide them with paid short-term
military leave, which plaintiffs define as periods of sixteen
days or fewer.  They further seek damages in an amount equal to

---

1.  The court has certified six subclasses in this action.  For
each of the three counts in plaintiffs' second amended
complaint, there are two subclasses--one for American pilots who
currently serve in the military and one for either former
American pilots who were employed with the airline and with a
military branch during the class period or current American
pilots who previously served in the military during the class
period.  The court has also excluded from each class any pilot
responsible for administering the AAG profit-sharing plan as
well as pilots who reached individual settlements with or
judgments against AAG or American over unpaid short-term
military leave.  See Scanlan v. Am. Airlines Grp., Inc., Civ A.
No. 18-4040, 2022 WL 1028038 (E.D. Pa. Apr. 6, 2022).

the difference between their salary at American and the amount
of compensation received for their military service for periods
of short-term military leave during the class period.

Count I, also a claim under USERRA, focuses on the
profit-sharing plan of AAG, American's parent company.  Under
the profit-sharing plan, AAG shares five percent of its pre-tax
profits with employees of American as well as its other
subsidiary airlines.  AAG calculates each participant's
individual award by dividing the five percent of its pre-tax
earnings by the aggregate amount of all participants' eligible
earnings and multiplying this resulting percentage by an
individual participant's eligible earnings.  AAG has not
credited military leave time as part of pilots' eligible
earnings.  Plaintiffs seek to compel AAG to recalculate and pay
profit-sharing awards in a manner that credits imputed income
for the time they spent serving in the military. The
profit-sharing plan, it should be noted, was established at
AAG's initiative and is not the product of any collective
bargaining agreement with the pilots or their unions.

Count II alleges a state-law breach-of-contract claim.
Plaintiffs contend that regardless of USERRA the language of the
profit-sharing plan obligates AAG to credit periods of military
leave when calculating plaintiffs' annual profit-sharing awards.

-4-

III

The essence of plaintiffs' claim in Count III is that American has violated USERRA by not compensating its pilots for the pay differential when they take military leave despite compensating them when they are on jury duty and bereavement leave.  Under USERRA, employees who take military leave are "entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees . . . who are on furlough or leave of absence." 38 U.S.C. § 4316(b)(1)(B).  As explained by our Court of Appeals, employers must offer employees compensation for military leave "when they choose to pay other employees for comparable forms of leave."  Travers v. Fed. Express Corp., 8 F.4th 198, 199 (3d Cir. 2021).

The Department of Labor has promulgated regulations interpreting § 4316(b).  The relevant regulation provides that an employee is entitled to "the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services."  20 C.F.R. § 1002.150(b).  The regulation also offers guidance for courts to consider in deciding whether a form of leave is comparable to military leave:

> In order to determine whether any two types
> of leave are comparable, the duration of the
> leave may be the most significant factor to
> compare.  For instance, a two-day funeral

-5-

leave will not be "comparable" to an
extended leave for service in the uniformed
service.  In addition to comparing the
duration of the absences, other factors such
as the purpose of the leave and the ability
of the employee to choose when to take the
leave should also be considered.

Id.

American moves for summary judgment on plaintiffs'
USERRA claim under count III on the ground that leaves for jury
duty and bereavement are not comparable to military leave.[2]  It
contends that military leave is distinguishable from the other
forms of leave in duration, frequency, purpose, and the ability
of a pilot to choose when to take that leave.

A.

American maintains that for comparison purposes the
average duration of all military leaves should be considered
rather than the average duration of only short-term military
leaves of sixteen days or fewer as plaintiffs allege.  American
argues that the comparison analysis under the regulation
requires that courts treat all military leaves the same.  Other
courts have endorsed this "generalized" approach.  See, e.g.,

_____

2.  American rehashes its argument that pay during leave is not
a "right" or "benefit" within the meaning of USERRA.  This court
rejected that argument at the motion-to-dismiss stage.  Scanlan
v. Am. Airlines Grp., Inc., 384 F. Supp. 3d 520, 526 (E.D. Pa.
2019).  Our Court of Appeals confirmed this understanding of
USERRA in Travers v. Federal Express Corp., 8 F.4th 198, 205-06
(3d Cir. 2021).  Federal courts have "uniformly" agreed with
this approach.  E.g., Haley v. Delta Airlines, Inc., Civ. A.
No. 21-1076, 2022 WL 950891, at *4 (N.D. Ga. Mar. 29, 2022).

Clarkson v. Alaska Airlines, Inc., Civ. A. No. 19-0005, 2021 WL
2080199, at *5 (E.D. Wash. May 24, 2021), appeal filed (9th Cir.
June 22, 2021).  Here, however, plaintiffs have expressly
limited the relief they seek in their second amended complaint
to leave periods of sixteen days or fewer.  They are the masters
of their complaint entitled to frame their claim and limit their
potential recovery in this way.  Accordingly, the court will
consider only military leave periods of sixteen days or shorter.

There is no dispute over the number of days during
which American pilots have taken military leave, bereavement
leave, and jury duty leave.  American pilots spend on average
more time on leave for military service than they do for jury
service or bereavement.  The average duration during the class
period of a single stint of short-term military leave is 3.2
days.  The average duration of a period of bereavement leave is
2.68 days while the average duration of a period of leave for
jury duty is 1.84 days.

An analysis of the frequency of military leave, along
with duration, is necessary to have a complete picture.  When
the frequency of each type of leave is calculated, the
difference between the amount of time American pilots spend on
military leave as compared to bereavement and jury duty leave is
stark.  Pilots who took military leave in any given year took an
average of seven periods of such leave that year during the

class period.  By contrast, pilots who performed jury duty
service in any given year took an average of 1.3 leave periods,
and pilots who took bereavement leave took 1.2 leave periods.
Thus, among pilots who took one of these forms of leave in a
particular year, the average number of days during which a pilot
was away from the job on short-term military leave was 21.9
days, while it was 3.1 days for bereavement leave, and 2.3 days
for jury duty.  There is a distinct difference among the three
types of leave not only in the average time away from the job in
a year but also in the fact that a pilot's military leave
generally recurs on a regular basis and often over a number of
years while the other forms of leave are generally short-term
and sporadic.

Plaintiffs argue frequency is an improper
consideration because it is not enumerated as a consideration in
§ 1002.150.  However, the regulation's list of factors is
expressly nonexhaustive.  See, e.g., Clarkson, 2021 WL 2080199,
at *5.  This is evidenced by the regulation's use of the phrases
"may be" and "such as."  Plaintiffs also maintain that
considering frequency would contravene USERRA's purpose.  The
court disagrees.  There is nothing in the language or purpose of
USERRA or its interpreting regulations which forbids
consideration of frequency in determining the issue of
comparability.  Furthermore, analyzing the duration of the

-8-

average military leave without considering frequency of military
leave provides a false impression in any comparison of military
leave with jury duty and bereavement leave.

B.

American next argues that short-term military leave is
distinguishable from other forms of leave in a pilot's ability
to control when to take leave.  American notes that pilots have
no control over when bereavement leave will be necessary or when
they must appear for jury duty, although American concedes that
postponement for jury duty may sometimes be granted.

The record reflects that pilots have varying levels of
flexibility in scheduling when to perform military service.
Some annual drill days are scheduled in October the year before.
In addition, some commanding officers will accommodate the
pilots' schedules.  For example, Scanlan admitted that he has
"negotiat[ed]" the dates on which he has performed certain
required air missions.  Riner testified that by virtue of her
position as a senior officer she was permitted to issue an order
to herself that required her to schedule her own military leave.
J.F. Joseph, an American Captain and former Naval officer,
corroborated that pilots have "unique and significant
flexibility . . . in how they schedule their military service
periods" and that military commanders schedule short-term duty
periods "with as much advanced notice and flexibility as

-9-

possible, to lessen the impact of military reserve absences on employers."

Plaintiffs dispute the extent to which pilots have flexibility in scheduling their military service.  They cite Joseph's testimony in which he acknowledges that a pilot's flexibility may be constrained by factors outside a servicemember's control such as the availability of aircrafts or the nature of a training event.  Scanlan noted that weather and staffing concerns also limit flexibility.  Patrick O'Rourke, an American pilot and retired member of the United States Marine Corps, testified that there is "virtually no flexibility" when it comes to performing certain duties under military orders. There is no dispute that for certain events set by military order, for example a "drill weekend," once the date has been set, attendance on that date is compulsory.

Plaintiffs also contend that the work assignment system of American bears some responsibility for creating the scheduling conflicts that necessitate short-term military leave. Pilots submit scheduling preferences for any given month on or before the 13th day of the prior month.  American considers these preferences along with each pilot's seniority when scheduling pilots for the month, but not every pilot receives his or her first-choice schedule.  Thus, plaintiffs contend that American pilots do not always have advanced notice of conflicts

between their work and military schedule.  In addition, the
relevant collective bargaining agreement requires American
pilots to notify the airline of known military absences and to
attempt to schedule their trips around those dates.
Accordingly, pilots "may not intentionally create a conflict
between their military duties and their duties flying for
American."

Even taking the facts in the light most favorable to
the plaintiffs, pilots often have significantly more flexibility
in scheduling military leave than they do with respect to jury
duty and bereavement leave.

C.

American further contends that military leave varies
from bereavement and jury-duty leave in its purpose.  Jury duty
is public service which satisfies a compulsory obligation to the
justice system.  Bereavement leave serves the dual purposes of
allowing pilots to grieve loved ones and providing them time to
ensure they are emotionally fit to fly.  In contrast, American
characterizes plaintiffs' military service as akin to a
"parallel career."

Plaintiffs disagree.  They argue that each of these
leaves serve the purpose of "satisfy[ing] compulsory obligations
to others."  There is no doubt that jury service is an important
civic duty.  Plaintiffs contend that bereavement leave also

falls into the category of service for others--satisfying obligations to mourn deceased family members and to ensure flight safety.  They assert that American's characterization of military service as a "parallel career" undersells the "public service dimension of military service."

In sum, it cannot be disputed that the purposes of the three types of leave are different.  Unlike bereavement leave and jury duty, those who take military leave do so not only out of a sense of patriotism but also for more than minimal compensation from the Government and sometimes pensions[3] for their service over an extended period and often for years.

D.

In assessing duration, frequency, control, and purpose, the court concludes as a matter of law that the undisputed evidence demonstrates that jury duty and bereavement leave are not comparable to military leave.  Thus, American has not violated § 4316(b)(1) of USERRA.  As noted above, for pilots who took short-term military leave, the average time away from the job on military leave annually is over 21 days while absence on jury duty is 2.3 days and on bereavement leave is 3.1 days. These figures are no more comparable than the home run records

---

3.   While none of the parties has mentioned this fact, the court takes judicial notice that pensions are paid to those serving in the military if their service is of sufficient length.

of two baseball players, one who hits 21 home runs in a season
and the other who hits three.  Looking only at the average
length of individual periods of military leave makes no sense,
just as it makes no sense to compare the home run records of
these two baseball players by looking only at the fact that both
hit no more than one home run in any game.  A pilot's military
leave is accompanied with more than minimal Government pay and
sometimes a pension and generally recurs at regular intervals
over a number of years while the two other types of leave
consist of short-term events and are infrequent with no outside
pay for bereavement leave and minimal Government pay for jury
duty with no pension.  Moreover, military leave is significantly
different in its purpose and in the degree of control which a
pilot has over when to take that leave.  Accordingly, the motion
of American for summary judgment on plaintiffs' USERRA claim in
count III of plaintiffs' second amended complaint will be
granted.

IV

AAG has also moved for summary judgment as to count I
of plaintiffs' second amended complaint, which is also a claim
under § 4316(b)(1) of USERRA but related to payments from AAG's
profit-sharing plan.  AAG contends that it does not need to
credit short-term military leave when calculating each pilot's
award under the plan because short-term military leave is not

comparable to jury duty and bereavement leave.  The
comparability analysis for plaintiffs' claim against American
for pay while on military leave in count III applies equally to
their claim against AAG for inclusion of imputed income while on
military leave in the calculation of profit-sharing awards.
Accordingly, the motion of AAG for summary judgment on count I
will likewise be granted.

V

Finally, the parties have filed cross-motions for
summary judgment as to plaintiffs' breach-of-contract claim
under count II.  They dispute whether the AAG profit-sharing
plan by its terms requires credit for military leave as
compensation.

The profit-sharing plan calculates each participant's
share of the plan's annual award based on his or her "Eligible
Earnings."  The profit-sharing plan defines "Eligible Earnings"
as "'Compensation,' as that term is used for purposes of
employer contributions" under the employee's applicable 401(k)
plan.  Thus, the court must determine whether the 401(k) plan
for American pilots treats as compensation imputed income for
time spent in military service.

The American 401(k) plan provides:  "'Compensation'
means, unless a different definition expressly applies pursuant
to Section 3.6," a series of types of employer contributions

-14-

listed under section 1.19.  Military leave is not listed in

section 1.19 or in the cross-referenced section 3.6.  The 401(k)

plan does, however, address "Qualified Military Service" in

section 3.5:

> Notwithstanding any other provision of the
> Plan to the contrary, contributions,
> benefits and service credit with respect to
> qualified military service shall be provided
> in accordance with [Internal Revenue Code]
> section 414(u).  For these purposes, during
> a period of qualified military service, an
> Eligible Employee will be considered to have
> received Compensation from the Employer at
> the same annual rate as the Eligible
> Employee's average rate of Compensation from
> the Employer during the 12 months
> immediately preceding the qualified military
> service (or, if shorter, the period of
> employment preceding the qualified military
> service).

Thus, the court must determine if the definition of

"compensation" under section 1.19 of the 401(k) plan is

exclusive or if section 3.5 adds military leave as a form of

compensation.

Texas law governs the contract.  Under Texas law,

construction of a contract is generally a question of law.  See,

e.g., Perthuis v. Baylor Miraca Genetics Labs., LLC, 645 S.W.3d

228, 235 (Tex. 2022).  "Only if ambiguity remains after applying

the pertinent rules of construction could there be a fact

question about intent."  Id. (internal quotation marks and

citation omitted).

Plaintiffs argue that section 3.5 of the 401(k) plan requires that time spent on military leave must be included in determining the profit-sharing plan awards.  Plaintiffs assert that section 3.5's treatment of military leave as compensation supersedes or at least modifies section 1.19's definition of "compensation" due to section 3.5's inclusion of the phrase "Notwithstanding any other provision of the Plan to the contrary."

AAG counters that section 1.19 and its cross-reference to section 3.6 provides the sole definition of "compensation" under American's 401(k) plan.  As mentioned above, section 1.19 does not include imputed income from time spent on military leave, and section 3.6 addresses a wholly unrelated matter.  AAG emphasizes that the clause of section 3.5 that requires it to credit military leave under the 401(k) plan is "[f]or . . . purposes" of complying with § 414(u) of the Internal Revenue Code.  This provision of the tax code is applicable only to pension plans and not to profit-sharing plans.

The court concludes that AAG has the better argument on the construction of the profit-sharing plan.  Section 3.5 of American's 401(k) plan expressly states that the reason for including imputed income during military leave is "for [the] purposes" of ensuring the 401(k) plan complies with section 414(u) of the Internal Revenue Code.  Section 414(u) of the

-16-

Internal Revenue Code is applicable only to pension plans.
This court has held that the AAG profit-sharing plan in issue
here is not a pension plan.  See Scanlan v. Am. Airlines Grp.,
Inc., 384 F. Supp. 3d 520, 531 (E.D. Pa. 2019).  Consequently
since the sole reason for including imputed income while on
military leave in the 401(k) plan is for tax purposes not
relevant to the profit-sharing plan, compensation under the
profit-sharing plan does not include imputed income while on
military leave.  The definition of compensation in section 1.9
of the pension plan governs without reference to section 3.5.

        Regardless of this court's interpretation, Texas law
requires the court to defer to an employer's interpretation of
its benefit plan under an employment contract if the contract
vests the employer with discretion to interpret the plan:

> where there is an employer-funded plan which
> is made a part of the employment contract
> between the employer and the employee, and
> with provisions which make the employer's
> determination final, that if the employer
> determines that an employee is not entitled
> to benefits, the only way that determination
> can be attacked is by showing that there was
> bad faith or fraud in the employer's
> actions.

Macy v. Waste Mgmt., Inc., 294 S.W.3d 638, 648 (Tex. App. 2009)
(citation omitted).

        The AAG profit-sharing plan vests "complete discretion
and authority to administer the Plan and to control its

operation" in the Compensation Committee of the Board of
Directors of AAG ("Compensation Committee").  This discretion
and authority includes "the power to determine which Employees
shall be designated Participants in the Plan [and] . . . to
interpret the Plan and the profit-sharing awards."  The plan
also provides:  "Any determination, decision or action of the
Committee in connection with the construction, interpretation,
administration or application of the Plan shall be final,
conclusive, and binding upon all persons, and shall be given the
maximum deference permitted by law."  There is no dispute that
the plan has been interpreted and awards paid from the beginning
in a manner that credits as compensation only W-2 wage income
and has not included imputed income while on military leave in
calculating awards.

      The evidence before the court cannot be read as
demonstrating anything other than that it was the Compensation
Committee that made these determinations.  While AAG also argues
that AAG designated American's officers to interpret and
administer the plan, there is no evidence called to the court's
attention that AAG did so.  The person to whom AAG makes
reference is Kim Wicker, the Director of Compensation of America
Airlines.  She testified that she simply oversaw the
calculations of the awards for each recipient.  There is nothing
in the record that she engaged in any interpretation of the

plan.  According to Wicker, an audit report is submitted to the
Compensation Committee annually before awards are disbursed.
She waits until after the report has been submitted and the
Compensation Committee has met before making any payouts.  She
is not identified as an officer of either AAG or American, and
her involvement can only be described as ministerial.

Plaintiffs further argue that there is no record that
the Compensation Committee ever adopted a separate written legal
interpretation of the definition of compensation under the AAG
profit sharing plan.  This argument misses the mark.  The law
makes no such requirement.  All that is required is an
employer's determination about what the plan means.  Actions,
not words, are decisive.  See Macy, 294 S.W. 3d at 648.

The AAG Compensation Committee has made its
determination, and there is no evidence that it has acted in bad
faith or engaged in fraud.  The Compensation Committee's
construction of term compensation is reasonable and has been its
construction from the beginning.  At the inception of the plan,
the pilots' union was informed that plan awards would be
calculated without including imputed revenue that pilots would
have received had they not been on military leave.  One pilots'
union representative testified that prior iterations of AAG
profit-sharing plans have historically credited only W-2 income.
Even if the court is incorrect in its interpretation of the

definition of compensation in the profit-sharing plan, it must defer under Texas law to the good faith determination of AAG's Compensation Committee that only W-2 income is included in calculating profit-sharing awards.

Plaintiffs have cited Mauldin v. Worldcom, Inc., 263 F.3d 1205 (10th Cir. 2001) to support its argument that AAG under Texas law did not properly delegate the authority to anyone to interpret the profit-sharing plan and did not ratify the unauthorized acts of the person who did interpret it.  This case is inapposite.  There, plaintiff sued his former employer over denial of benefits under an employment stock option agreement.  The company's board of directors had delegated to its compensation committee the interpretation and administration of the agreement.  It was undisputed that the vice president of the defendant-company, who was not a compensation committee member, made the decision to deny the plaintiff's claim that his benefits had vested under that stock option agreement.  The board thereafter passed a resolution retroactively adopting all actions taken by the vice president.  The resolution, however, did not specifically reference the employee's claim, the vice president's decision to deny the employee's claim under the stock option agreement, or his reasons for denying the claim. Applying Texas law, the Tenth Circuit held that this resolution was insufficient to support ratification of the vice president's

unauthorized interpretation of the agreement.  The Court
reasoned that the board did not have before it sufficient
information to make an informed decision.

Here, in contrast, there is no evidence that anyone
other than the members of the AAG Compensation Committee made
the determination as to how the profit-sharing plan should be
interpreted.  Wicker did not make the decision as to what
compensation meant.  Wicker's position and role were far less
consequential than the position and role of the vice president
in Mauldin who had made the critical decision adverse to the
plaintiff there.

The motion of plaintiffs for summary judgment as to
their breach-of-contract claim under count II of their second
amended complaint will be denied.[4]  Defendants' motion for
summary judgment as to plaintiffs' breach-of-contract claim will
be granted.

---

4.   Plaintiffs have also moved for summary judgment on the
affirmative defenses of laches, estoppel, and waiver, which
defendants asserted in their answer.  Defendants stated in their
opposition to plaintiffs' motion that they do not intend to
pursue any of these defenses.  In light of the court's granting
of summary judgment on all counts in favor of defendants, the
motion of plaintiffs for summary judgment as to defendants'
affirmative defenses of laches, estoppel, and waiver will be
denied as moot.